IN THE MATTER OF: H.N.J. and A.S.J.
No. COA09-871
Court of Appeals of North Carolina
Filed November 3, 2009
Gillam and Gillam, by M. Braxton Gillam, III, for petitioner-appellee, Northampton County Department of Social Services. Mary McCullers Reece, for respondent-appellant, father. Pamela Newell Williams for respondent-appellee, Guardian Ad litem.
ERVIN, Judge.
Robert J., respondent father, appeals from permanency planning orders which awarded guardianship of his daughters, H.N.J. (Heather) and A.S.J. (Amy),[1] to David and Holley King (the Kings). After carefully reviewing the record in light of the applicable law, we affirm the trial court's orders.[2]
Respondent father and Brandi D. (mother)[3] are the parents of Heather and Amy. On 14 April 2007, Respondent father drove while he was intoxicated. Both children were passengers in his car on this occasion. As he drove, Respondent father was involved in an accident. Heather was not secured in her car seat when the accident occurred. After the accident, Respondent father was arrested for driving while impaired and the children were taken to a hospital for examination. Since the mother arrived at the hospital in an intoxicated condition, the staff would not release the children into her care and contacted the Northampton County Department of Social Services (DSS). With the consent of Respondent father and the mother, the children were placed with the Kings, who were family friends.
On 11 January 2008, DSS filed juvenile petitions alleging that Heather, age 4, and Amy, age 2, were neglected and dependent juveniles. In these petitions, DSS noted that the Kings had continued to care for the children since April 2007. According to the allegations set out in the petitions, Respondent father and the mother were unable to provide proper care, supervision, stable housing, and other necessities for the children as a result of their substance abuse and other problems. In addition, DSS alleged that Respondent father was currently incarcerated in the Hertford County Jail; that Respondent father had been previously incarcerated for larceny, breaking and entering, and injury to real property; and that the mother had moved at least seven times since April 2007. The petition further alleged that the mother voluntarily placed the children with the Kings and that Respondent father had consented to this placement.
After conducting an adjudication hearing on 22 April 2008, the trial court adjudicated Heather and Amy to be neglected and dependent juveniles. In separate adjudication orders, the trial court found that, since the children's placement with the Kings, Respondent father and the mother had not provided stable housing, proper care, and supervision for the children; that, since April 2007, the mother had moved seven times, had been in jail, and had been involuntarily committed. In addition, the trial court found that Respondent father had been in the custody of Hertford County and the Department of Correction since September 2007. The trial court also found that DSS had referred the parents for mental health and substance abuse counseling; however, Respondent father had been arrested in September 2007 and the mother had failed to follow through with treatment.
In its disposition orders, the trial court found that a home study of the Kings' home had produced positive results; that the Kings' residence was an appropriate placement for the children; that Respondent father and the mother had a history of substance abuse; and that Respondent father would be required to serve approximately seventy-five more days in the custody of the Department of Correction. As a result, the trial court ordered continued placement of the children with the Kings and ordered both parents to find and maintain housing, to obtain mental health and substance abuse assessments and comply with any treatment recommendations, and to submit to drug screens.
On 22 July 2008, the trial court conducted a review hearing. In an order filed on 29 August 2008, the trial court found that Respondent father had obtained a substance abuse assessment while in the DART program; that Respondent father had authorized the Department of Correction to release his records to the DSS; that Respondent father was currently under house arrest and living in his father's home; and that Respondent father was trying to "get his job back[.]" The trial court ordered Respondent father to cooperate with random drug screens by his probation officer, to provide all of his DART after-care information to DSS, and to participate in supervised visitation. The trial court also excused Respondent father from any additional obligation to submit to a substance abuse assessment or a mental health evaluation.
After conducting another review hearing on 28 October 2008, the trial court entered separate orders in which it found that the children remained in the care of the Kings, who had been meeting their physical and emotional needs. The trial court found that Respondent father: (1) was living in his father's home and was on electronic house arrest; (2) lacked adequate housing for his children; (3) had been convicted and incarcerated for driving while impaired as a result of the April 2007 wreck; (4) was involved in parenting skills classes, but had not completed them; (5) had failed to follow discharge recommendations from the DART program following his release from incarceration, including participation in Narcotics Anonymous/Alcoholics Anonymous; (6) lacked employment; (7) was providing child support for the children; and (8) had participated in five successful supervised visits with the children since the entry of the last review order. The trial court concluded that "DSS should continue to make reasonable efforts to eliminate placement of the juveniles because the Respondent Parents have made what may be characterized as a fair amount of progress to be in a position to regain custody of the minor children." As a result, the trial court ordered Respondent father to make substantial efforts to obtain suitable housing for himself and the children; to submit to random drug tests; to attend Narcotics Anonymous meetings at least twice a week and provide written proof of attendance; and to pay child support.
On 24 March 2009, the trial court conducted a permanency planning hearing. At that hearing, DSS social worker Teresa Gilliam (Ms. Gilliam) testified for the agency. Respondent father did not present any evidence. On 22 April 2009, the trial court entered separate permanency planning orders pertaining to each child. The court adopted guardianship with the Kings as the permanent plan for both Heather and Amy. The court allowed supervised visitation between Respondent father and both children. However, the trial court did not authorize visitation between the mother and the children because she had tested positive for cocaine and had not been seeking treatment. Respondent father noted an appeal from the trial court's permanency planning orders to this Court, contending that the trial court erred by concluding that guardianship should be the permanent plan for Heather and Amy.[4]
The General Assembly has required that permanency planning proceedings be conducted for the purpose of "develop[ing] a plan to achieve a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-907(a). "Appellate review of a permanency planning order is limited to [determining] whether there is competent evidence in the record to support the findings and the findings support the conclusions of law." In re S.J.M., 184 N.C. App. 42, 47, 645 S.E.2d 798, 801 (2007), aff'd per curiam, 362 N.C. 230, 657 S.E.2d 354 (2008) (citation omitted). In the event that they are supported by competent evidence, the findings of fact made by the trial court in a permanency planning order are conclusive on appeal. In re Weiler, 158 N.C. App. 473, 477, 581 S.E.2d 134, 137 (2003). However, the trial court's conclusions of law are subject to de novo review, In re D.H., 177 N.C. App. 700, 703, 629 S.E.2d 920, 922 (2006) and its dispositional decision is subject to review for an abuse of discretion. In re A.H., 183 N.C. App. 609, 613, 644 S.E.2d 635, 638 (2007) (citation omitted).
In his initial challenge to the trial court's permanency planning orders, Respondent father contends that Finding of Fact Nos. 32, 36, 41 and 42 are not supported by sufficient record evidence. After carefully reviewing the record, we conclude that each of the challenged findings of fact had adequate evidentiary support.
In Finding of Fact No. 32, the trial court found "[t]hat the Respondent Father is not employed and has not found employment during the pendency of this case."[5] In challenging this finding, Respondent father argues that "he was paying his child support regularly and earnestly looking for work" and that DSS was putting Respondent father in a "no-win" situation by arguing that, "if he got a full-time job, the girls would have to go to daycare or stay with relatives, which the social worker deemed to be detrimental to [Respondent father's] bonding with his children." However, the record clearly reflects that Ms. Gilliam testified that Respondent father was currently unemployed and looking for employment. A 27 January 2009 report from the Guardian ad litem, which the trial court admitted into evidence, also noted Respondent father's lack of employment. The appropriateness of any arguments advanced by DSS on the basis of Respondent father's lack of employment simply does not relate to the sufficiency of the evidence to support the challenged finding of fact. As a result, we conclude that Finding of Fact No. 32 has ample evidentiary support.
The trial court found in Finding of Fact No. 36 that Respondent father "has made progress during the pendency of this case toward his substance abuse treatment, and several of his addictive behaviors overall[,] but the children have bonded in their current placement and appear to be well-cared for and happy." Respondent father contends that Finding of Fact No. 36 is inconsistent with the policies underlying the Juvenile Code, including "the value of family reunification in considering the best interests of the children." At the permanency planning hearing, however, Ms. Gilliam testified that Respondent father was subject to random drug screens; that he had tested negative; that Respondent father was attending AA meetings twice each week; and that Respondent father was participating in substance abuse treatment once each week. Furthermore, the Guardian ad litem report stated that Heather and Amy are "very happy and secure in their present placement"; "have a wonderful environment in which to grow and develop"; and "have been enveloped by this loving family." Once again, Respondent father's challenge to Finding of Fact No. 36 appears to be directed more toward the use which the trial court made of the information contained in that finding rather than the sufficiency of the evidence to support it. After carefully reviewing the record, including the testimony that we have summarized above, we conclude that Finding of Fact No. 36 has sufficient evidentiary support.
Finally, in Finding of Fact Nos. 41 and 42, the trial court stated:
41. That it is contrary to the best interest of the minor child to be returned to the home of either Respondent Parent at this time because the Respondent Parents lack employment and housing. The Respondent Father has failed to follow through on the recommendations by DART/Cherry and he has not demonstrated that he is able to provide for the children. The Respondent Mother has failed to obtain a substance abuse assessment and has tested positive for the use of illegal substances.
42. That it is unlikely that the minor child could be returned home to either the Respondent mother or the Respondent father in the next six months due to the Respondent mother's instability and drug use, and the Respondent father's inability to provide a safe, permanent home for the child.
Respondent father attacks these factual findings on a number of different grounds.
Respondent father contends that he "was living with his [own] father in an appropriate home, providing child support for his girls, having negative results on his random drug screens, attending AA twice weekly as recommended, and searching for employment." Respondent father specifically questions "[t]he trial court's finding that [he] was not complying with his DART/Cherry aftercare recommendation" on the grounds that it "did not tell the whole story as to [his] compliance efforts," since "this finding was based upon the July 2008 recommendation that [Respondent father] attend after care upon discharge from DART." According to Respondent father, he "underwent further assessment for substance abuse in January 2009"; this "assessment indicated that `no further treatment is recommended' and that `[f]ollow up with local AA meetings is recommended.'" Since he was "following up with his local AA," Respondent father argued that he "did not need to participate in aftercare at the time of the permanency planning hearing" and "was fully compliant with the recommendations of his current substance abuse recovery plan." According to Respondent father, "[t]he social worker acknowledged at trial that [he] had done everything DSS asked him to do."
On the other hand, Ms. Gilliam testified that Respondent father lacked employment, that he was behind in paying his probation fees, and that he had "no viable means of providing care financially for his kids at this time." She also indicated that Respondent father did not have independent housing and had been living with his father since his release from incarceration. Ms. Gilliam further stated that the DART/Cherry program had recommended that Respondent father have aftercare and participate in Intensive Outpatient Services and that a January 2009 assessment had recommended that Respondent father comply with the DART/Cherry Program recommendations. The Guardian ad litem's report further noted that Respondent father's father had recently lost his job; that Respondent father was "behind in his child support;" and that Respondent father's "probation is in jeopardy due to his failure to pay the associated fees according to his probation officer." In addition, the Guardian ad litem recommended that Respondent father submit to a hair test for the presence of controlled substances; that he comply with all of the recommendations made by the DART/Cherry Program for his substance abuse; and that he secure employment and a stable home for himself.
A careful examination of the evidentiary record establishes that Finding of Fact Nos. 41 and 42 have ample evidentiary support. Although the evidence received at the permanency planning hearing clearly indicated that Respondent father had made commendable progress since being released from the custody of the Department of Correction, the record also indicated that Respondent father had been unable to find a job, that he was dependent on his own father for housing, and that he was not in a position to provide for the children using his own resources. At bottom, Respondent father's challenge to Finding of Fact Nos. 41 and 42 represents a disagreement with the inferences that the trial court drew from the evidence rather than a genuine challenge to the sufficiency of the evidence to support the findings of fact in question. Since the inferences that the trial court draws from evidence to properly support factual findings constitute a matter for the trial court which we are not authorized to disturb on appeal, see In re Whisnant, 71 N.C. App. 439, 441, 322 S.E.2d 434, 435 (1984) (stating that it is the trial judge's duty to "weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom") (citation omitted), we conclude that Respondent father's challenge to Finding of Fact Nos. 41 and 42 is without merit and that these findings of fact have adequate evidentiary support.
Finally, Respondent father contends the trial court's findings of fact do not support its conclusion and determination that "the best plan to achieve a safe, permanent home for [Heather and Amy] within a reasonable time is to change the permanent plan to custody with a court-approved caretaker and it is in [their] best interest that [they] remain [] with [the Kings]." After carefully reviewing the trial court's findings of fact, we conclude that they are sufficient to support the trial court's conclusion and that the trial court did not abuse its discretion by concluding that the best interests of the children would be served by adopting guardianship with the Kings as the permanent plan.
One of the stated purposes of the Juvenile Code is "[t]o provide standards . . . for ensuring that the best interests of the juvenile are of paramount consideration by the court and that when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time." N.C. Gen. Stat. § 7B-100(5). The Supreme Court has emphasized that "the fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody [is] . . . that the best interest of the child is the polar star." In re Montgomery, 311 N.C. 101, 109, 316 S.E.2d 246, 251 (1984). As has already been noted, In re D.H., 177 N.C. App. at 703, 629 S.E.2d at 922, we review a trial court's conclusions under a de novo standard, and review its determination regarding the best interest of the child for an abuse of discretion. In re D.S.A., 181 N.C. App. 715, 720, 641 S.E.2d 18, 22 (2007) (citation omitted). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." White v. White, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).
The trial court's findings of fact, which are either unchallenged on appeal or which we have found to be supported by sufficient evidence, state:
26. That the Respondent Father was released from house arrest on November 24, 2008. He will remain on supervised probation until January 6, 2011. He has not had any violations of probation filed, although he is behind in his probation fees.
27. That the Respondent Father has visited with the children seven times since the last hearing. The minor child [Amy] exhibits signs of detachment from the Respondent Father. She does not approach him during the visits, and prefers to be held by [Mrs. King]. She will tell Respondent father that [Mr. King] is her father.
28. That the Respondent Father is providing child support for the minor children.
29. That the Respondent Father currently resides with his father.
30. That the Respondent Father had a random drug screen on January 22, 2009, and the results were negative.
31. That the Respondent Father attends Alcoholics Anonymous meetings twice a week.
32. That the Respondent Father is not employed and has not found employment during the pendency of this case.
33. That the Respondent Father does not have a valid driver's license.
34. That the Respondent Father is not complying with the DART/Cherry aftercare plan.
. . . .
36. That the Respondent Father has made progress during the pendency of this case toward his substance abuse treatment and several of his addictive behaviors overall but the children have bonded in their current placement and appear to be well-cared for and happy.
37. That [the Kings] have been the caretakers for the children since being called to the hospital on April 14, 2007, after the car wreck.
38. That both children have been in the continuous physical custody of the Kings since April 14, 2007.
39. That the Kings are meeting the physical and emotional needs of the minor child. [Heather] refers to [Mr.] King as "Uncle David" and refers to [Mrs.] King as "Aunt Holley. [Amy] refers to [Mr.] King as "Daddy" and refers to [Mrs.] King as "Mama."
40. That there was no evidence presented that the minor child could be returned to the Respondent Father or the Respondent Mother immediately and no evidence presented that she could be returned to them or either of them within the next six months.
41. That it is contrary to the best interest of the minor [children] to be returned to the home of either Respondent Parent at this time because the Respondent Parents lack employment and housing. The Respondent Father has failed to follow through on the recommendations by DART/Cherry and he has not demonstrated that he is able to provide for the children. . . .
42. That it is unlikely that the minor [children] could be returned home to either the Respondent [M]other or Respondent [F]ather in the next six months due to the Respondent [M]other's instability and drug use and the Respondent [F]ather's inability to provide a safe, permanent home for the [children].
43. That no other relatives are available or willing to provide care in a safe home in that the Department has previously explored placement and since that time, none of these relatives have contacted the Department to offer themselves as placement sources for the minor children.
44. That pursuant to North Carolina General Statute § 7B-907, the permanent plan for the minor child was reunification with one or either of the parents. The Department recommends changing the plan to custody with a court-approved caretaker and that the Court approved [the Kings] as the court-approved caretakers.
45. That the best plan of care to achieve a safe, permanent home for the minor child within a reasonable time is by appointing a guardian of the person of the juvenile.
46. That it is in the best interests of the minor children that [the Kings] be appointed their guardians.
. . . .
48. That termination of parental rights should not be considered at this time.
49. That the Respondent parents shall continue to pay child support for the minor children.
. . . .
51. That appropriate visitation with the Respondent Father is in the best interest of the minor child, and consistent with the child's welfare and safety, visitation with the Respondent Father would involve supervised visitation at least each Sunday from 10:00 o'clock a.m. until 6:00 o'clock p.m., with supervision by [the Kings], or either of them.
52. That as the juvenile[s have] resided with [the Kings] for more than a year and the placement is stable and that continuation of the placement is in the child's best interests, neither the child's best interest nor the rights of any party require that [a] review hearing be held every six months.
Respondent father appears to challenge the trial court's conclusion that guardianship with the Kings would be in Heather and Amy's best interest on the grounds that the trial court "deemed that the natural parent could not offer the children a better home than the placement family and left the girls in placement indefinitely." According to Respondent father, the trial court weighed Respondent father's "abilities to financially provide . . . against the financial status of the placement family; his home with his father was weighed against the placement family's home; his bond with his youngest daughter was compared to that of the placement family;" and he was found wanting in this comparison. By adopting this approach, Respondent father contends that the trial court failed to heed the statutory admonition to focus on "the value of family reunification" and, consequently, "abused its discretion."
A careful examination of the trial court's findings of fact reveals, however, that the trial court did not act in the manner described by Respondent father. The trial court's findings of fact describe both the situation faced by Respondent father and the benefits that would accrue to Heather and Amy were they to remain with the Kings. In addressing the situation faced by Respondent father, the trial court noted that he (1) was still on probation; (2) was behind in the payment of his probation fees, although he had not yet been the subject of a violation report; (3) had, despite seven successful visits, experienced bonding difficulties with Amy; (4) had been unable to find employment; (5) lived with his father; (6) did not have a valid driver's license; and (7) had not been complying with his DART/Cherry aftercare plan, although he did attend AA meetings on a regular basis. The trial court's findings provide a rational basis for a conclusion that Respondent father faced potential legal difficulties, that he had not completed the process of mastering his prior substance abuse problems, that he did not seem to have any prospect of achieving near-term economic self-sufficiency, and that he remained dependent on others for basic necessities of life, such as housing. Although there is no question that Respondent father had been making progress, which probably explains why the trial court determined that "termination of parental rights should not be considered at this time" and authorized continued visitation, these factual findings amply justify the trial court's determination that it was not possible to return the children to Respondent father at the time of the permanency planning hearing and that it was unlikely that they could be returned to him within the next six months. Given this set of circumstances and the successful placement that the children had experienced at the Kings, we conclude that the trial court did not either engage in a weighing process of the type described in Respondent father's brief or commit any error of law in the process of concluding that guardianship was the appropriate permanent plan for the juveniles for purposes of this proceeding.
As a result, for the reasons set forth above, we conclude that the challenged findings of fact have sufficient evidentiary support; that the trial court's findings support its conclusion that the best interest of the children would be served by making the Kings guardians of the children; and that the trial court did not abuse its discretion by concluding that guardianship was the best plan "to achieve a safe, permanent home for the juvenile within a reasonable period of time" as contemplated by N.C. Gen. Stat. § 7B-907(a). For that reason, we conclude that the trial court's permanency planning orders are free from prejudicial error and should be affirmed.
Affirmed.
Judges WYNN and STEELMAN concur.
Report per Rule 30(e).
NOTES
[1] Heather and Amy are pseudonyms which will be used in this opinion in order to protect the privacy of the juveniles and for ease of reading.
[2] Although the trial court entered separate orders with respect to each juvenile, the two orders are nearly identical. For that reason, this opinion is drafted as if the trial court had only entered a single order. However, our decisions as set out in this opinion apply to both of the trial court's permanency planning orders.
[3] The mother is not participating in the proceedings before this Court.
[4] Since the trial court's permanency planning orders changed the custody of Heather and Amy from the DSS to the Kings, these orders are appealable pursuant to N.C. Gen. Stat. § 7B-1001(a)(4).
[5] Although it entered separate orders relating to each child, the trial court made essentially identical findings and conclusions in each order.